## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **STONHARD, a division of Stoncor Group, Inc.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 19-cv-03006** |
| **RONALD E. GABRIEL and CENTRAL ILLINOIS COATINGS, INC.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

This cause is before the Court on the Motion for Preliminary Injunction (d/e 4) filed by Plaintiff Stonhard, a division of Stoncor Group, Inc. (Stonhard). Because Stonhard has not shown a reasonable likelihood of success on the merits, the motion is DENIED.

## I. PROCEDURAL BACKGROUND

On January 10, 2019, Stonhard filed a Complaint for Injunctive and Other Relief (d/e 1). Count I of the Complaint asserts a claim for breach of contract against Defendant Ronald E.

Gabriel (Gabriel), a former employee of Stonhard. Stonhard alleges that Gabriel breached the noncompete provision of the employment agreement Gabriel entered into with Stonhard by obtaining employment with, and becoming a shareholder of, Central Illinois Coatings, Inc. (CIC), a direct competitor of Stonhard in central Illinois. Count II of the Complaint is a tortious interference claim against CIC in which Stonhard alleges that CIC has continued to employ Gabriel despite having knowledge of the employment agreement Gabriel entered into with Stonhard. Stonhard seeks monetary damages as well as preliminary and permanent injunctions against Gabriel and CIC.

On January 14, 2019, Stonhard filed its Motion for Preliminary Injunction. Stonhard asks the Court to preliminarily enjoin Gabriel from performing services for CIC in any capacity; performing activities that compete with Stonhard in Illinois, Wisconsin, Michigan, Minnesota, Missouri, Indiana, Iowa, Ohio, and parts of Kentucky; and using or disclosing any non-public information that was entrusted to Gabriel by Stonhard or to which Gabriel had access by virtue of his employment with Stonhard. See Proposed Order (d/e 6), ¶¶ 1-2; Transcript (d/e 24), at 15

(Stonhard's counsel noting that Iowa should have been included in the proposed order but was not).  Stonhard also asks the Court to enjoin CIC from employing Gabriel, receiving services from Gabriel in any capacity, and using any non-public information belonging to Stonhard that was disclosed to CIC by Gabriel.  See Proposed Order, ¶¶ 3-4.

On January 25, 2019, Gabriel filed his Memorandum of Law in Response to Plaintiff Request for Preliminary Injunction (d/e 20).  Gabriel argues that Stonhard cannot establish irreparable harm, claiming that he does not possess Stonhard's confidential information and will not, while the noncompete provision remains in effect, contact or solicit Stonhard customers that Gabriel contacted while working for Stonhard.  Response (d/e 20), at 11.  Gabriel also argues that the harm he will suffer if the Court issues the preliminary injunction requested by Stonhard weighs heavily against the issuance of the preliminary injunction.  Id. at 14-15.

At an evidentiary hearing held on January 29, 2019, the Court heard testimony from Gabriel; Reed Goodwin, Stonhard's National Linings Manager; and Matthew Connelly, Stonhard's Area Manager for the Great Lakes West region.  The Court also admitted several

exhibits tendered at the hearing by Stonhard and Gabriel. No one attended the hearing on behalf of CIC.

## II. FACTUAL BACKGROUND

Stonhard manufactures and installs epoxy, polyurethane, and methyl methacrylate (MMA) floors, walls, and lining systems. Connelly Certification (d/e 5-1), ¶ 4; Goodwin Affidavit (d/e 5-2), ¶ 3. Unlike some other companies in this industry, Stonhard manufactures its own materials to be used during the installation process. Transcript, at 182. Stonhard's products are installed by third-party contractors who install only Stonhard's products. Id. at 26, 131-32.

A significant amount of Stonhard's business is obtained through a competitive bidding process in which potential customers solicit bids from various companies for a project before awarding that project to a particular company. Transcript, at 68. A customer's decision on which company to award a project to is based on pricing, goodwill, and the relationship between the customer and each company that submits a bid. Id. at 68-69.

On November 4, 2013, Gabriel began his employment with Stonhard as a Territory Manager assigned to central Illinois. Id. at

27. Gabriel and Stonhard entered into an employment agreement

that contained the following provisions:

5.1　I recognize that Stonhard will necessarily share with me various kinds of Stonhard's Confidential Information. I further recognize that I will be using this Confidential Information in the course of performing my duties of employment for Stonhard. I also recognize that this Confidential Information would be of value to any business entity competing with Stonhard. I further recognize that I may receive training in the performance of my Stonhard employment duties and/or relating to Stonhard's products, which training would make me of value to a business entity competing with Stonhard. I still further recognize that such training and the Stonhard Confidential Information I will be receiving collectively represent a significant dollar expense and investment by Stonhard. Accordingly:

5.1.1　During my employment with Stonhard, and for a period of two (2) years subsequent to termination of my employment, regardless of the reason for such termination, I shall not compete with Stonhard by engaging in any activity similar to the activities I undertake during the course of my employment with Stonhard. I further agree that during such two-year period subsequent to termination of my employment, I shall not, directly or indirectly, solicit any Stonhard employee to work for me, for my employer or for any Stonhard competitor.

5.1.2　I acknowledge and agree that the geographic scope of this Covenant shall include any assigned territory in which I worked while employed by Stonhard.

Complaint, Ex. A, ¶¶ 5.1, 5.1.1, 5.1.2.  The employment agreement defined "Classified Information" to include any version or edition, in any form or format, of Stonhard's SFA,[1] Stonhard's P-File,[2] and Stonhard's Price Guide as well as any raw data used to prepare any such version or edition and any data items contained in any such version or edition.  Id. ¶ 2.2.  The employment agreement defined "Confidential Information" to include, in addition to "Classified Information," the following:

> [A]ll of Stonhard's other proprietary, non-public information, including operating plans, prices, pricing policies, customer lists and identities, supplier lists and identities, installer lists and identities, raw and purchased material specifications, product and equipment specifications, reports, records, memoranda, notes, sales training materials, sales and marketing strategies and business practices, techniques and plans for Stonhard, including its operating units, groups and regions.

Id. ¶ 2.3.  With the exception of raw material specifications, Gabriel had access to all "Confidential Information" that did not meet the definition of "Classified Information."  Transcript, at 48-50.  Gabriel agreed to refrain from using any "Confidential Information" other

---

[1] SFA stands for Sales Force Automation.  Transcript (d/e 24), at 29.

[2] The P-File is an iPad given to certain Stonhard employees that contains a brief rundown of Stonhard selling points for customers.  Transcript, at 48.

than "for Stonhard's benefit in the course of performing [Gabriel's] employment duties for Stonhard."  Complaint, Ex. A, ¶ 6.2(a).

Gabriel's duties as a Territory Manager included pursuing and generating sales leads, developing relationships with customers and general contractors, and negotiating contract terms with Stonhard's customers and prospective customers.  Connelly Certification, ¶ 11. As a Territory Manager, Gabriel prepared proposals to submit to Stonhard's customers or prospective customers.  Transcript, at 28. These proposals included price terms for Stonhard's products and installation, the latter of which included labor overhead.  Id. at 29. As a Territory Manager, Gabriel had the ability to increase or decrease the price of a particular project, although the approval of an Area Manager would have been needed during Gabriel's first year with Stonhard (and potentially even after that, depending on the size of the project and the products involved).  Id. at 194-96.

Gabriel's duties as a Territory Manager also included overseeing the installation of Stonhard's products, which entailed coordinating material delivery, negotiating with subcontractors to perform installation work, and analyzing the cost and overhead of various projects.  Connelly Certification, ¶ 12; Transcript, at 43-44.

As part of Gabriele's training as a Territory Manager, he learned about Stonhard's sales techniques and sales strategies.  Transcript, at 56.  Prior to obtaining employment with Stonhard, Gabriel knew nothing about pricing epoxy or MMA floors and had not received training on the different materials that Stonhard sells.  Id. at 45.

Through his employment with Stonhard, Gabriel was introduced to Stonhard's customers and prospective customers in the geographic regions to which he was assigned.  Connelly Certification, ¶ 13.  Throughout his employment with Stonhard, Gabriel developed and maintained relationships with Stonhard's customers.  Id.  Of the Stonhard customers Gabriel worked with, an overwhelming majority were customers that Gabriel first met while working for Stonhard.  Transcript, at 45-46.

As a Stonhard employee, Gabriel had access to customer lists, customer contact information, sales leads, information on customer needs and requirements, and discounts and other contractual terms pertaining to particular customers.  Connelly Certification, ¶ 14.  Gabriel also had access to Stonhard's confidential pricing information and Stonhard's method for pricing materials and installation services.  Id.  At no time did Gabriel have access to the

profit margin for any particular project. Gabriel Affidavit (d/e 20-1), ¶ 11. Stonhard does not disclose profit margin to its Territory Managers. Transcript, at 194.

Stonhard takes steps to prevent the disclosure of confidential information to the public, including Stonhard's competitors. Gabriel Affidavit, ¶ 15. The identity of Stonhard's customers, the contact information for those customers, the nature and terms of Stonhard's business relationships, and Stonhard's pricing formulas are not known by Stonhard's competitors and cannot be determined through public sources. Goodwin Affidavit, ¶ 4.

While employed by Stonhard, Gabriel had access to Stonhard's SFA, a computer application Gabriel accessed with a username and password specific to him. Transcript, at 29-30; Gabriel Affidavit, ¶ 10. The SFA, which Gabriel used to price projects, contains customer contact information, a history of communications with customers or potential customers, quotes provided to customers, and notes about customer needs or preferences. Id. at 30-31. After speaking with a customer or potential customer, Gabriel would enter notes in the SFA about the conversation. Id. at 31.

The SFA also contains detailed information on projects that Stonhard bid on and was awarded, including customer contacts and information on pricing, labor costs, and material costs. Id. at 31-32, 134. Information in the SFA on a customer's previous projects can assist a Territory Manager in preparing a quote for another project that the customer would find acceptable. Id. at 39. The information in Stonhard's SFA is not available to Stonhard's competitors. Id. at 35.

As a Territory Manager, Gabriel had access to certain SFA information for all of Stonhard's customers and potential customers in central Illinois. Id. at 36. Gabriel had access to information on labor charges, labor overhead, material list prices, material quotes, and miscellaneous charges, but he did not have access to information on cost of sales percentages, material costs, estimated use taxes, or gross profit percentages. Id. at 41-43. Gabriel, as a Territory Manager, did not have access to SFA information for any territory other than the territory assigned to Gabriel. Id. at 121.

On or about September 1, 2017, Stonhard promoted Gabriel to the position of Regional Linings Manager. Goodwin Affidavit, ¶ 7; Transcript, at 138. While still responsible for business

development, Gabriel's focus as a Regional Linings Manager shifted from all of Stonhard's products to Stonhard's Stonchem line of products.  Goodwin Affidavit, ¶ 9; Transcript, at 139.  Due to his promotion, Gabriel's assigned territory expanded to include the states of Illinois, Wisconsin, Michigan, Minnesota, Missouri, Iowa, Indiana, Ohio, and areas of Kentucky that included the cities of Lexington and Louisville.  Goodwin Affidavit, ¶ 9; Transcript, at 15. Accordingly, as a Regional Linings Manager, Gabriel had access to SFA information for all of Stonhard's customers and potential customers in 26 territories.  Transcript, at 36, 56, 121.  During his time as a Regional Linings Manager, Gabriel reported to Reed Goodwin (Goodwin).  Id. at 57.

Around November 7, 2017, Gary Zimmerman (Zimmerman) initiated a conversation with Gabriel about purchasing CIC's assets. Transcript, at 76, 142-43.  Over the next several months, while Gabriel was employed by Stonhard, Gabriel and Zimmerman had extensive business discussions and exchanged information.  Id. at 85, 89-90, 143.  Gabriel indicated that he could take over Zimmerman's role of pricing jobs for CIC's customers.  Id. at 86.

In May 2018, Coatings of Illinois, Inc. (Coatings of Illinois), was incorporated in the State of Illinois. Transcript, at 63, 76; Pl. Ex. 8. In August 2018, Gabriel and Zimmerman's two sons signed an agreement on behalf of Coatings of Illinois through which Coatings of Illinois purchased CIC's assets.[3] Transcript, at 62, 76; Asset Purchase Agreement (d/e 19-2).

On September 9, 2018, Gabriel resigned his employment with Stonhard. Goodwin Affidavit, ¶ 15; Transcript, at 76. Gabriel tendered a resignation letter to Goodwin. Transcript, at 58-59; Goodwin Affidavit, Ex. B. In addition to the resignation letter, Gabriel had a conversation with Goodwin in which Gabriel stated that he needed to be closer to his family and assist his mother on the family farm. Transcript, at 59, 61; Gabriel Affidavit, ¶ 4. Gabriel did not tell Goodwin anything about purchasing CIC's assets or forming a new company that would compete with Stonhard. Transcript, at 59, 76, 154. Nor did Gabriel tell Stonhard anything about his plan to compete with Stonhard after receiving a

---

[3] Coatings of Illinois does business as Central Illinois Coatings. Transcript, at 71. In this Opinion, the Court refers to Gabriel's current business as Coatings of Illinois and to the company that sold its assets to Coatings of Illinois as CIC.

letter from Stonhard's counsel reminding Gabriel of his obligations under the employment agreement.  Id. at 66-67.

Gabriel's reason for not informing Stonhard's of his intention to compete with Stonhard was the fact that the asset purchase had not yet been finalized.  Id. at 65, 67.  However, at the time Gabriel submitted his letter of resignation, Gabriel was fairly certain that the asset purchase was going to go through.  Id. at 140.  Gabriel did not take any materials from Stonhard when he left Stonhard's employ.  Id. at 134.  Since resigning from Stonhard, Gabriel has not had access to the SFA, the information contained therein, or any confidential or proprietary materials relating to his employment with Stonhard.  Id. at 134, 138; Gabriel Affidavit, ¶ 7.

Gabriel closed on the deal to purchase CIC's assets around September 29, 2018.  Transcript, at 76-77, 96-97.  Gabriel is a 50% owner of Coatings of Illinois, which purchased CIC's trade name, licenses, and customer goodwill.  Transcript, at 88-89, 91-92; see also Asset Purchase Agreement, ¶¶ 1.1, 2.4.  Other CIC assets purchased by Coatings of Illinois included customer lists, customer information and sales histories, quotes, bids, and sales orders. Asset Purchase Agreement, ¶ 1.1(c).  Zimmerman had records on

customer contacts and products sold to the CIC customers listed in Exhibit B of the Asset Purchase Agreement.  Id. at 144-45. Zimmerman and his sons had preexisting relationships with these customers prior to Gabriel establishing Coatings of Illinois.  Id.

Coatings of Illinois is headquartered in Decatur, Illinois, which falls within the territory for which Gabriel was responsible while working for Stonhard as a Territory Manager.  Transcript, at 88. Gabriel is the president of Coatings of Illinois.  Id. at 81.  In that role, Gabriel has undertaken the pricing of projects for Coatings of Illinois.  Id. at 86.

Coatings of Illinois, instead of manufacturing resinous flooring products, purchases such products from manufacturers at the prices set by the manufacturers.  Id. at 137-38; Gabriel Affidavit, ¶¶ 12-13.  The price that Coatings of Illinois quotes on a project can depend on the customer's requirements with respect to materials. Transcript, at 133.  For example, some of Coatings of Illinois' customers are contractually obligated to install a product from a particular manufacturer.  Id.  Stonhard's manufacturing competitors produce products similar to Stonchem.  Id. at 54.

Coatings of Illinois cannot buy Stonhard's products, sell Stonhard's products, or use Stonhard's installers.  Id. at 135. Gabriel testified that the price Stonhard charges for its products would not affect in any way the amount of a bid Coatings of Illinois submitted to a customer.  Id. at 136.  Gabriel claims that the training he received on Stonhard's products is not useful to him in his role for Coatings of Illinois.  Id. at 144.  Gabriel also claims that information about Stonhard's prices for materials and Stonhard's installation costs, without knowing the profit margin, is of no use to him.  Id. at 142.

Coatings of Illinois is an installation competitor of Stonhard in central Illinois, just as CIC was one of Stonhard's installation competitors when Gabriel was employed by Stonhard.  Transcript, at 27, 70-72, 84.  CIC sold and installed products obtained from manufacturers other than Stonhard.  Id. at 70.  CIC's annual revenues averaged around $2.8 million.  Id. at 117.  Gabriel expects the annual revenues for Coatings of Illinois to stay at that level until his noncompete agreement with Stonhard expires.  Id. at 118-19.

Coatings of Illinois obtains the majority of its revenue through the labor used to install the products purchased by Coatings of

Illinois' customers.  Id. at 137; Gabriel Affidavit, ¶ 17.  Unlike

Stonhard, Coatings of Illinois has employees who perform the

installation services.  Transcript, at 131; Gabriel Affidavit, ¶ 14.

Coatings of Illinois does not use Stonhard's installation contractors.

Transcript, at 131.  Gabriel does not know what Stonhard pays its

contractors and claims that amount does not figure into Coatings of

Illinois' installation cost estimates.  Id. at 131-32.  Coatings of

Illinois uses records from previous installations going back to about

1991 to estimate material and installation costs on current projects.

Id. at 132, 136-37, 141-42; Gabriel Affidavit, ¶ 16.

Prior to the expiration of the noncompete provision of his

employment agreement with Stonhard, Gabriel will refrain from

soliciting business from Stonhard customers who had not been

customers of CIC.  Transcript, at 69-70, 149; Gabriel Affidavit, ¶ 7.

Since leaving Stonhard's employ, Gabriel, in attempting to obtain

work for Coatings of Illinois, has contacted only people who were

customers of CIC.  Id. at 82.  Gabriel has sent proposals and pricing

information to various customers, some of which are both former

customers of CIC and current customers of Stonhard.  Id. at 87.

Stonhard and CIC shared several customers. ADM, located in Decatur, Illinois, is a customer of Stonhard and was a long-time customer of CIC. Transcript, at 33-34, 98, 146-47. Other Stonhard customers that were also customers of CIC include Kraft Foods, Curry Construction, Mars Chocolate Company, Nestle, Caterpillar, and Ingredion. Id. at 98-99, 101, 103, 105-07, 113-14. For some of these companies, including Kraft Foods, Gabriel's contact while working at Stonhard was a third-party contractor completing a project for the company. Id. at 148. Gabriel has been soliciting jobs from Kraft Foods on behalf of Coatings of Illinois through a general contractor. Id. at 102-03.

While working for Stonhard, Gabriel contacted people with Curry Construction in an attempt to generate work for Stonhard. Id. at 99. Of Gabriel's contacts at Curry Construction, Gabriel first met some while working for Stonhard but first met others while working for Coatings of Illinois. Id. at 113. Gabriel has solicited jobs from Curry Construction since he began running Coatings of Illinois, but he had not reached out to the contact person he used when soliciting jobs from Curry Construction while working for Stonhard. Id. at 100.

Gabriel did not solicit Mars Chocolate Company while employed by Stonhard, but he did solicit another Mars entity during that time.  Id. at 104, 148.  Mars Chocolate Company became a customer of CIC 20 to 25 years ago.  Id. at 148.  While working for Stonhard, Gabriel solicited Ingredion but never serviced a job for that company, and he is currently attempting to get work from Ingredion for Coatings of Illinois.  Id. at 106-07.  Since forming Coatings of Illinois, Gabriel has contacted Caterpillar.  Id. at 107.

Although Gabriel developed goodwill in relationships with people at Hawkins Chemical and Continental Tire, he has not contacted either company on behalf of Coatings of Illinois.  Id. at 108-09.  Coatings of Illinois completed, through a contractor, a project for Pinnacle Foods, another of Stonhard's customers with which Gabriel developed goodwill and relationships.  Id. at 110-111. Although CIC had submitted a bid to NTN Bower Bearing, another Stonhard customer that Gabriel worked with during his tenure with Stonhard, Coatings of Illinois has not done any work for NTN Bower Bearing.  Id. at 111-12.

In describing the harm that Stonhard would suffer if Gabriel is allowed to continue working for Coatings of Illinois, Goodwin stated

that it "comes down to relationships and development" before noting that Stonhard would lose an employee-contact for various customers who would have to deal with a new Stonhard employee in the future. Id. at 154-55. According to Goodwin, Gabriel has information that Stonhard's other competitors do not have, including recent quotes, purchase histories, customer orders, and customer contact information. Id. at 155-56. However, Goodwin testified to having no idea how Gabriel would have knowledge of this information, given Gabriel's inability to access Stonhard's SFA. Id. at 159. Goodwin admitted that Gabriel would not know the current price of Stonhard's products or whether those prices had increased or decreased since his resignation from Stonhard. Id. at 160-61. Goodwin also admitted that some information known to Gabriel due to his employment with Stonhard, such as product data and resin type, is available on Stonhard's website. Id. at 157.

### III. ANALYSIS

As noted above, Stonhard seeks a preliminary injunction enjoining Gabriel from performing services for CIC in any capacity; performing activities that compete with Stonhard in Illinois, Wisconsin, Michigan, Minnesota, Missouri Indiana, Iowa, Ohio, and

parts of Kentucky; and using or disclosing any non-public information that was entrusted to Gabriel by Stonhard or to which Gabriel had access by virtue of his employment with Stonhard. Stonhard also seeks a preliminary injunction enjoining CIC from employing Gabriel, receiving services from Gabriel in any capacity, or using any non-public information belonging to Stonhard that was disclosed to CIC by Gabriel.[4]

"A preliminary injunction is an extraordinary remedy that is available only when the movant shows clear need." Turnell v. CentiMark Corp., 796 F.3d 656, 661 (7th Cir. 2015). A party seeking to obtain a preliminary injunction must demonstrate: (1) a reasonable likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that the party will suffer irreparable harm if the injunction is not granted. See Planned Parenthood of Ind., Inc., v. Comm'n of Ind. State Dep't of Health, 699 F.3d 962, 972 (7th Cir. 2012).

---

[4] Stonhard's Complaint alleges that Gabriel became an employee of CIC after resigning from Stonhard. Complaint (d/e 1), ¶ 39. However, Stonhard now admits that Gabriel never became an employee of CIC. See Transcript, at 170-171. In addition, CIC was voluntarily dissolved on October 10, 2018. Motion for Summary Judgment, Ex. D (d/e 19-4). Therefore, the Court's analysis will focus solely on Stonhard's request for injunctive relief against Gabriel.

If these threshold conditions are met, the district court then weighs the balance of the harm to the parties if the injunction is granted or denied. Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc., 549 F.3d 1079, 1086 (7th Cir. 2008). That is, the Court must consider the irreparable harm to Stonhard if the preliminary injunction is wrongfully denied versus the irreparable harm to Gabriel if the preliminary injunction is wrongfully granted. See Turnell, 796 F.3d at 662. The Court must also consider the effects, if any, the grant or denial of the preliminary injunction would have on non-parties (the public interest). Id.

The threshold for establishing a likelihood of success on the merits is low. Michigan v. U.S. Army Corps of Eng'rs, 667 F.3d 765, 782 (7th Cir. 2011); see also Girl Scouts of Manitou Council, 549 F.3d at 1096 (noting that the party seeking a preliminary injunction "must show that it has a 'better than negligible' chance of success on the merits on at least one of its claims," which is an "admittedly low requirement") (citations omitted). This low threshold is a byproduct of the fact that "the granting of a preliminary injunction is not a decision on the merits of the plaintiff's suit," but rather "a decision that the suit has enough

merit . . . to justify an order that will freeze the situation" for the time needed to determine whether the suit is meritorious. <u>Ayres v. City of Chicago</u>, 125 F.3d 1010, 1013 (7th Cir. 1997).

Stonhard has not satisfied the threshold requirements for the issuance of a preliminary injunction. Specifically, Stonhard has not demonstrated a reasonable likelihood of success on the merits of its breach of contract claim against Gabriel. While Stonhard has established that Gabriel and Stonhard entered into an employment agreement containing a noncompete provision, that provision, as written, is too broad to be enforced against Gabriel under New Jersey Law. While the noncompete provision can still be partially enforced, Stonhard has failed to offer evidence that Gabriel has breached the enforceable portion of that provision since leaving his employment with Stonhard.

Stonhard's claim against Gabriel sounds in breach of contract and alleges that Gabriel violated the noncompete provision of the parties' employment agreement. By its terms, the employment agreement is to be construed in accordance with New Jersey law on contract construction. Complaint, Ex. A, ¶ 19.1. Under New Jersey law, the elements of a breach of contract claim are (1) a contract, (2)

a breach of that contract, (3) damages flowing from the breach, and (4) the plaintiff's performance of its own contractual duties. <u>Nat'l Reprographics, Inc. v. Strom</u>, 621 F. Supp. 2d 204, 222 (D.N.J. 2009).

Neither Stonhard nor Gabriel dispute that they entered into a valid employment agreement in November 2013. However, the parties' agreement on that point does not necessitate a finding that the noncompete provision of the agreement is enforceable.

A noncompete agreement is enforceable under New Jersey law if the agreement protects the employer's legitimate interests, imposes no undue hardship on the employee, and is not injurious to the public. <u>Maw v. Advanced Clinical Commc'ns, Inc.</u>, 846 A.2d 604, 609 (N.J. 2004). The first two prongs of this test require a balancing of the employer's need to protect its legitimate interests and the asserted hardship on the employee. <u>Id.</u> The third prong requires the Court "to analyze the public's broad concern in fostering competition, creativity, and ingenuity." <u>Id.</u> Courts must evaluate the reasonableness of a noncompete agreement based on "the individual circumstances of the employer and employee." <u>Ingersoll-Rand Co. v. Ciavatta</u>, 542 A.2d 879, 894 (N.J. 1988).

The scope of activities prohibited by a noncompete agreement should be considered in determining whether the agreement is overbroad.  The Cmty. Hosp. Grp., Inc. v. More, 869 A.2d 884, 897 (N.J. 2005).[5]  The actions prohibited must be narrowly tailored to ensure that the noncompete agreement "is no broader than necessary to protect the employer's interests."  Id.  A noncompete agreement "may be disregarded or given complete or partial enforcement to the extent reasonable under the circumstances."  Id.

## A.     Stonhard's Protectable Interests

An employer has a legitimate interest in protecting its confidential business information and customer relationships. Whitmyer Bros. v. Doyle, 274 A.2d 577, 581 (N.J. 1971); Ingersoll-Rand, 542 A.2d at 887.  However, an employer "has no legitimate interest in preventing competition."  Whitmyer Bros., 274 A.2d at 581.  Where an employer's interests in enforcing a noncompete agreement do not adequately touch upon the employer's confidential information, customer relationships, or other

---

[5] The duration and geographic limits of the noncompete agreement are also relevant in determining whether the agreement is overbroad.  More, 869 A.2d at 897.  Because Gabriel does not challenge the duration or geographic limits of the noncompete provision in the employment agreement between Gabriel and Stonhard, the Court presumes that the duration and geographic limits of that provision are reasonable.

protectable interest, the noncompete agreement "merely stifles competition and therefore is unenforceable." <u>Nat'l Reprographics, Inc. v. Strom</u>, 621 F. Supp. 2d 204, 226 (D.N.J. 2009) (citing <u>Ingersoll-Rand</u>, 542 A.2d at 892).

"[K]nowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's person" that the employee can use "in any business or profession he may choose, including a competitive business with his former employer." <u>Ingersoll-Rand</u>, 542 A.2d at 892. Therefore, "[a]n employer may not prevent an employee from using the general skills in an industry which have been built up over the employee's tenure with the employer." <u>Coskey's Television & Radio Sales & Serv., Inc. v. Foti</u>, 602 A.2d 789, 794 (N.J. Super. 1992) (citing <u>Whitmyer Bros.</u>, 274 A.2d at 581). Similarly, matters of general knowledge within the industry may not be classified as confidential information entitled to protection. <u>Whitmyer Bros.</u>, 274 A.2d at 581.

Gabriel, during his tenure as a Stonhard employee, had access to certain of Stonhard's confidential information, including customer lists containing contact information, pricing information,

and information on specialty products. In addition, Gabriel worked with numerous Stonhard customers, forming relationships with customer contacts and negotiating prices and other contract terms for particular projects. This confidential information and these customer relationships are legitimate business interests that Stonhard can protect through a noncompete provision applicable to Gabriel.

However, this holding does not end the Court's inquiry on the enforceability of the noncompete provision in the employment agreement entered into by Stonhard and Gabriel, for the provision must be no broader than is "reasonably necessary" to protect Stonhard's legitimate business interests. See Platinum Mgmt., Inc. v. Dahms, 666 A.2d 1028, 1037 (N.J. Super. Ct. Law. Div. 1995). Accordingly, the Court must examine in detail the actions prohibited by the noncompete provision and how those prohibitions operate to protect Stonhard's confidential information and customer relationships.

The noncompete provision of the employment agreement purports to prevent Gabriel from "engaging in any activity similar to the activities [Gabriel] undert[ook] during the course of [his]

employment with Stonhard." Complaint, Ex. A, ¶ 5.1.1. Stonhard interprets this provision as preventing Gabriel, for a certain amount of time, from working for Coatings of Illinois in any capacity. <u>See</u> Proposed Order, ¶ 1. As the Court explains below, imposing such a broad prohibition on Gabriel is not reasonably necessary to protect Stonhard's confidential information or customer relationships.

First, the Court notes that some information Gabriel might recall from his employment with Stonhard, including certain product data, is available to anyone who visits Stonhard's website. As such, it does not meet the "Confidential Information" definition included in the employment agreement. <u>See</u> Complaint, Ex. A, ¶ 2.3 (limiting "Confidential Information" to Stonhard's "proprietary, <u>non-public</u> information") (emphasis added).

Second, some of the confidential information Gabriel had access to was located in Stonhard's SFA. Gabriel has not had access to this information since resigning his employment with Stonhard, as the SFA is password-protected. Likewise, Gabriel no longer has access to any confidential or proprietary materials or documents related to his employment with Stonhard.

Stonhard claims that Gabriel could use his knowledge of Stonhard's confidential information on prices and installers to unfairly compete with Stonhard. However, the facts presented to the Court suggest that whatever knowledge Gabriel has relating to Stonhard's prices and installers would not allow him to unfairly compete with Stonhard. For example, Stonhard admits that Gabriel would have no idea whether the pricing information known to him as a Stonhard employee is still accurate.

In addition, Stonhard and Coatings of Illinois have markedly different business models. Stonhard manufacturers its own resinous flooring products, products that Coatings of Illinois cannot buy or sell. Coatings of Illinois, on the other hand, purchases resinous flooring products from manufacturers other than Stonhard at prices set by those manufacturers. In addition, Stonhard has its products installed by contractors that install only Stonhard's products, contractors that Coatings of Illinois cannot use. Coatings of Illinois, on the other hand, has employees who perform the installation work and earns the majority of its revenue from the installation labor. In short, while Coatings of Illinois operates in the same industry as Stonhard, the differences in the two companies'

business models results in Coatings of Illinois deriving no benefit from knowing Stonhard's confidential information regarding prices and installers.

The cases on which Stonhard relies in arguing that the noncompete provision of Stonhard's employment agreement with Gabriel is reasonably necessary to protect Stonhard's confidential information are distinguishable from this case.  Indeed, these cases involve former employees that served their former employers as high-level executives and/or obtained information about the former employers' confidential business strategies and revenue trends.

For example, in National Reprographics, Inc. v. Strom, Strom worked for the plaintiff as a district manager "responsible for ensuring [his] region's profitability" who "oversaw all production and sales operations in the region, and participated in corporate activities, such as strategic business planning."  621 F. Supp. 2d at 212.  Strom was also a member of the plaintiff's Strategic Business Planning Committee, which was responsible for setting and developing the plaintiff's "annual business strategies and goals."  Id. at 209.  As a member of this committee, Strom "was exposed to a considerable amount of potentially sensitive competitive

information" through "high-level confidential discussions" on "strategic planning, financial performance, . . . revenue trends, [and] marketing plans." Id. at 226-27. The district court held that this "sensitive competitive information" was entitled to protection through a noncompete clause. Id. at 225-26.

In HR Staffing Consultants LLC v. Butts, the plaintiff, a healthcare staffing company, had placed Butts with CarePoint, a New Jersey hospital system, and Butts rose to the position of Vice President of Cardiovascular Services. 627 Fed. App'x 168, 170 (3d Cir. 2015). After suing CarePoint, the plaintiff entered talks with several of CarePoint's competitors about possible business opportunities. Id. at 171. Butts was aware of the plaintiff's discussions with the competitors, primarily because Butts had been copied on e-mails concerning those discussions. Id. Butts resigned from the plaintiff's employ in order to work directly for CarePoint. Id. The Third Circuit held (1) that the district court's conclusion that Butts was in a position to undermine the plaintiff's plans with CarePoint's competitors for Carepoint's benefit was not clearly erroneous and (2) that the noncompete agreement between Butts

and the plaintiff was enforceable to protect the plaintiff's "interest in safeguarding confidential information." Id. at 172.

Gabriel, however, was not a high-ranking executive at any point during his tenure at Stonhard. Gabriel began his employment as a Territory Manager, Stonhard's equivalent of an entry-level salesman. Gabriel was later promoted, becoming a Regional Linings Manager. Gabriel's new position came with an expanded sales territory and a specialty line of products to sell but not supervisory authority over any other Stonhard employee. While Gabriel was privy to some of Stonhard's confidential information during his time as a Stonhard employee, the Court has been presented with no evidence that Gabriel was involved in high-level corporate discussions or had knowledge of Stonhard's national business strategies or revenue trends.

Had Gabriel been privy to such high-level information while employed by Stonhard, the noncompete provision prohibiting Gabriel from competing with Stonhard in any way may have been reasonably necessary to protect Stonhard's confidential information. However, based on the information presented to the Court, Gabriel was not privy to such information, and, for the

reasons set forth above, the noncompete provision is not reasonably necessary to protect Stonhard's legitimate interests in protecting its confidential information relating to pricing and installers.

No doubt Gabriel is much more knowledgeable today about the industry in which Stonhard operates than he was when Stonhard first hired him. But the fact that Gabriel today has a better understanding of what lining product a potential customer needs or the proposed price that will make a bid competitive do not justify a noncompete provision that completely prohibits him from working in the same industry as Stonhard. Stonhard cannot prevent Gabriel from utilizing his general knowledge of the lining industry and the skills he developed while working for Stonhard, even if Gabriel uses that knowledge and those skills to compete with Stonhard. See Ingersoll-Rand, 542 A.2d at 892; Foti, 602 A.2d at 794.

Having discussed Stonhard's confidential information related to prices and installers, the Court now addresses Stonhard's confidential information regarding its customers. As a Stonhard employee, Gabriel had access to Stonhard's customer lists, which contain the identity and contact information of Stonhard's

customers. Gabriel also had access to information on the needs and requirements of Stonhard's customers. Such confidential information can be protected through the use of a noncompete provision. See Platinum Mgmt., 666 A.2d at 1038. Because Stonhard's interest in protecting customer information is related to Stonhard's interest in protecting customer relationships, the Court combines its analysis of these two interests as they relate to the enforceability of the noncompete provision applicable to Gabriel.

According to Stonhard, the noncompete provision of the employment agreement prohibits Gabriel from soliciting not only Stonhard's customers, but also any prospective customer of Stonhard, regardless of whether Stonhard had ever contacted that prospective customer. Such a restriction is designed to prevent competition, not protect confidential customer information or customer relationships. See Foti, 602 A.2d at 795 ("Foti worked on hundreds of proposals which resulted in unsuccessful bids. Such efforts were part of the everyday work not only of plaintiff, but also of all its competitors, and it was unfair to make such contacts the triggering actions to warrant injunctive relief."); Platinum Mgmt., 666 A.2d at 1039 ("The prohibition in the covenant, however, to the

extent it covers prospective customers that were only solicited by PMI, is overbroad and, thus, unenforceable."). Indeed, Stonhard's customer relationships and confidential customer information are not implicated to the extent Gabriel solicits business from companies that have no business relationship with Stonhard.

An employer's interest in preventing competition is not one that can be protected through a noncompete agreement. Whitmyer Bros., 274 A.2d at 581. To the extent that the noncompete provision of the employment agreement between Stonhard and Gabriel prohibits Gabriel from soliciting companies that have never been Stonhard customers, even if Stonhard, at one time, solicited business from those companies, the noncompete provision is unreasonable and, therefore, unenforceable.

This is not to say that the noncompete provision is necessarily reasonable as it applies to Stonhard's customers, as testimony at the evidentiary hearing established that several Stonhard customers did business with CIC before CIC sold its assets to Coatings of Illinois. Gabriel testified that Coatings of Illinois has solicited business from several Stonhard customers that had also been customers of CIC. The noncompete provision in the

employment agreement is not reasonably necessary to protect

Stonhard's confidential information relating to these customers.

Coatings of Illinois purchased CIC's customer lists, customer

information and sales histories, quotes, bids, and sales orders.

With these documents, Gabriel has all the information he needs to

service CIC's former clients without relying on Stonhard's

information on those clients.

In addition, the noncompete provision is not reasonably

necessary to protect Stonhard's relationships with customers who

also did business with CIC.  These companies had previously

decided, perhaps while Gabriel was employed by Stonhard, to have

CIC, not Stonhard, install an industrial lining or perform a similar

service.[6]  The relationship between any such company and

Stonhard was, therefore, not to the exclusion of CIC, and a

noncompete provision preventing Gabriel from soliciting business

from these companies on Coatings of Illinois' behalf is not

---

[6] The Court's analysis as to a particular company may have been different had
it been established that the company had used Stonhard exclusively for its
industrial lining needs for the last several years.

reasonably necessary to protect Stonhard's customer relationships and would merely stifle competition.[7]

Stonhard's confidential information and customer relationships are legitimate business interests worthy of protection through a noncompete provision.  However, the noncompete provision of the employment agreement entered into by Stonhard and Gabriel, which precludes Gabriel from competing with Stonhard in any capacity for two years, is not reasonably necessary to protect Stonhard's that information and those relationships.

However, the Court need not find the noncompete provision completely unenforceable.  Even though the noncompete provision in the employment agreement is too broad to be enforced as written, the Court may still partially enforce that provision.  See More, 869 A.2d at 897 (noting that a noncompete agreement "may be . . . given

---

[7] Of course, Stonhard is not precluded from protecting customer relationships simply because those relationships are nonexclusive.  See Platinum Mgmt., 666 A.2d at 1040.  However, in determining whether a noncompete provision is reasonably necessary to protect a former employer's customers relationships, it is relevant whether the former employee has taken up with (1) a company with no preexisting business relationships with the former employer's customers or (2) a company that has such relationships with those customers.  Here, it is undisputed that CIC did work for several Stonhard customers prior to Gabriel resigning his position with Stonhard.

complete or partial enforcement to the extent reasonable under the circumstances").

The Court finds that the noncompete provision of the employment agreement, to the extent that it prevents Gabriel from soliciting individuals and companies who were Stonhard customers prior to Gabriel's resignation from Stonhard and were not also customers of CIC, is reasonably necessary to protect Stonhard's confidential customer information and customer relationships and, therefore, enforceable. The reasonableness of this prohibition does not extend, however, to current Stonhard customers that did not do business with Stonhard prior to Gabriel's resignation. Prohibiting Gabriel's solicitation of these relatively new Stonhard customers is not necessary to protect Stonhard's confidential information or relationships with those customers, information Gabriel would not know and relationships he would not have helped create. Accordingly, the remainder of the Court's analysis on whether Stonhard is entitled to a preliminary injunction will treat the noncompete provision of the employment agreement as prohibiting Gabriel only from soliciting individuals and companies who were

Stonhard customers prior to Gabriel's resignation from Stonhard and were not also customers of CIC.

**B. Burden Imposed on Gabriel**

The noncompete provision of the employment agreement, to the extent the Court finds it enforceable against Gabriel, does not impose an undue burden on Gabriel. Determining whether an undue burden is imposed on an employee requires the Court to "determine the likelihood of the employee finding other work in his or her field, and the burden the restriction places on the employee." More, 869 A.2d at 898. Courts are less likely to find undue hardship where the employee's termination of the employment relationship has brought a noncompete provision into play. Id.

Prohibiting Gabriel from soliciting business from most Stonhard customers that were not also customers of CIC will not impose an undue hardship on Gabriel. Gabriel testified at the evidentiary hearing that he would not solicit from Stonhard customers if they had not also done business with CIC. Gabriel also testified that, until the noncompete provision is no longer in effect, he expects the annual revenues for Coatings of Illinois to remain at the level realized by CIC when CIC was in business.

### C.  Injury to the Public

To the extent the Court has found the noncompete provision of the employment agreement enforceable, the provision is not injurious to the public.  In considering the public interest, courts "consider the demand for services offered by the employee and the likelihood that those services can be provided by others working in the area."  <u>Chemetall US Inc. v. Laflamme</u>, No. CV 16-780 (JLL), 2016 WL 885309, at *15 (D.N.J. Mar. 8, 2016).

The noncompete agreement, to the extent it is enforceable, prohibits Gabriel from soliciting business that were customers of Stonhard prior to Gabriel's resignation from Stonhard who did not have a business relationship with CIC.  Although these companies cannot deal with Gabriel for their industrial lining needs, the companies have other options, including Stonhard and the similar companies that operate near Coatings of Illinois' facility.  <u>See</u> Transcript, at 75-76.  The potential inconvenience to Stonhard customers looking for an alternative is not a sufficient reason to find the noncompete provision of the employment agreement between Stonhard and Gabriel completely unenforceable.

In conclusion, Stonhard has shown that a valid employment agreement between Gabriel and Stonhard exists, but the noncompete provision of the agreement is not enforceable as written.  Rather, the noncompete provision is enforceable against Gabriel only to the extent that it prohibits Gabriel from soliciting companies that were customers of Stonhard prior to Gabriel's resignation from Stonhard and did not have a business relationship with CIC.

The resulting problem for Stonhard is that it has not provided evidence that Gabriel has violated the noncompete provision to the extent it is enforceable.  Although Stonhard elicited testimony establishing that Gabriel has solicited certain of Stonhard's customers on behalf of Coatings of Illinois, Stonhard has provided no evidence that those customers were not also customers of CIC prior to Gabriel's resignation from Stonhard.  And Gabriel testified that he has no intention of soliciting Stonhard customers who had no business dealings with CIC.  While Stonhard may doubt Gabriel on this point, particularly given that Gabriel was less than completely forthcoming regarding the reasons he was leaving Stonhard, Stonhard has not shown that Gabriel has solicited, on

behalf of Coatings of Illinois, Stonhard customers with no prior relationship with CIC.

There can be no success on a breach of contract claim without evidence of a breach by the defendant. Stonhard has not presented evidence that Gabriel has breached the noncompete provision of the employment agreement between Stonhard and Gabriel, to the extent that provision is enforceable. Therefore, Stonhard has not shown a better than negligible likelihood of success on the merits of its breach of contract claim against Gabriel. The Court need not analyze whether Stonhard has shown irreparable harm or the lack of an adequate remedy at law. In addition, the Court need not weigh the balance of the harm to the parties that would result if a preliminary injunction is granted or denied.

## IV. CONCLUSION

For the reasons stated, Plaintiff's Motion for Preliminary Injunction (d/e 4) is DENIED.

ENTER: September 30, 2019

*/s/ Sue E. Myerscough*
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE